# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

Bobby J. Jackson Sr.,

                        Plaintiff,

v.

Ramsey County Adult Detention
Center, Bob Fletcher, Rich Rodriguez,
and MacKenzie Johnson,

                        Defendants.[1]

Case No.  21-cv-0929 (DSD/HB)

**REPORT AND
RECOMMENDATION**

---

This matter is before the Court on Defendants' Motion for Summary Judgment
[ECF No. 34].  This motion has been referred to the undersigned for a report and
recommendation under 28 U.S.C. § 636 and D. Minn. LR. 72.1.  Based on the following,
it is respectfully recommended that the motion be granted.

## I.  Factual Background[2]

Plaintiff Bobby J. Jackson, then an inmate at the Minnesota Correction Facility-
Stillwater, initiated this action on April 5, 2021.  [ECF Nos. 1–3.]  Jackson alleges, and

---

[1] The Court corrects Plaintiff's erroneous or incomplete spelling of Defendants' names.

[2] Jackson's complaint recites the facts surrounding his claims and incorporates by
reference exhibits including grievance forms and grievance letters to jail officials.
Jackson signed his complaint and declared "under penalty of perjury that the above
complaint is true to the best of my [ ] information, knowledge, and belief."  (Compl. at 5.)
"A plaintiff's verified complaint is the equivalent of an affidavit for purposes of summary
judgment, and a complaint signed and dated as true under penalty of perjury satisfies the
requirements of a verified complaint, 28 U.S.C. § 1746."  *Roberson v. Hayti Police
Dep't*, 241 F.3d 992, 994-95 (8th Cir. 2001).  Accordingly, to the extent—but only to the
extent—the statements within the Complaint and exhibits purport to describe specific
facts of which Jackson had personal knowledge and would be competent to testify, and
that would be admissible in evidence, the Court will treat the complaint and attachments
as a declaration for the purposes of this motion.  *See* Fed. R. Civ. P. 56(c)(4).

Defendants do not contest, that he was a detainee at the Ramsey County Adult Detention Center ("ADC") from November 3, 2020, to February 10, 2021.  (Compl. ¶ A [ECF No. 1].)

Previously the ADC used paper forms for inmates who wished to request medical services.  Under that system, there were physical lockboxes in each housing unit, or pod. (Burkhart Decl. ¶ 2 [ECF No. 37].)  Detainees were supposed to fill out paper forms to request medical services and place the completed forms in the lockbox for their pod. (*Id*.) Public health staff would then collect the forms from the lockboxes and use them to deliver medical care to the detainees.  (*Id*.)

The paper system presented problems.  For example, detainees would frequently put medical requests on a standard inmate request form instead of using the lockbox system.  (*Id*. ¶ 4.)  The detainee would then hand the standard inmate request form to an officer who would need to read the request when he or she had time, recognize it as a medical request, and transmit the request to appropriate public health staff.  (*Id*.)  Another problem was that even when detainees used the medical request form, the detainee would put the form in the door of the cell instead of into the lockbox. (*Id*.)  This also required officers to collect the requests, recognize them as medical requests, and transmit the requests to appropriate public health staff.  (*Id*.)  The paper system slowed down the transmission of medical requests and subjected officers to allegations that requests were not timely delivered.

At some point, the ADC replaced the paper medical request forms with a digital kiosk system, called TurnKey. (*Id.* ¶¶ 1, 3.)  The digital kiosk system resolved these

issues.  (*Id*. ¶ 3.)  Each detainee has a unique password that enables them to directly transmit medical requests using the kiosk.  (*Id*. ¶ 3.)  Inmates can send their medical requests in an electronic form directly to public health staff. (*Id*.)  The digital kiosk system eliminates the use of officers as middle people for the transmission of medical requests.  (*Id*. ¶ 6.)  As a result, the new system provides greater privacy for detainees because no officer need handle or see a detainee's medical request.  (*Id*.)

However, the digital kiosk system is not without faults.  The practice at the ADC is to allow only one inmate at the kiosk at a time. (*Id*.)  But the kiosk is attached to a twelve-to-eighteen-inch monitor, and it is accessible only during recreation time, when up to twenty other inmates may be in the same room.  (*See* Pl.'s Exs. D, G [ECF No. 1-1 at 4, 8-9.)  Inmates in the room with the kiosk can read the information on the screen.

Jackson alleges that his HIV/AIDS diagnosis was exposed within the jail when he used the kiosk in November 2020.  (Compl. ¶¶ B–F; Pl.'s Ex. F [ECF No. 1-1 at 6-7].)  Specifically, he alleges that on November 14, 2020, he asked for a paper medical request form, but unnamed nurses directed him towards the digital kiosk.  (Compl. ¶ B.)  He asked twice more on November 20 and 21 and received the same response.  (*Id*. ¶¶ C–D.)  On November 21 and 22, he used the kiosk to request medical treatment for his HIV/AIDS and mental illness diagnosis.  (*Id*. ¶¶ E–F.)[3]  On December 13, 2020, Jackson filed a health request and grievance form stating that he was "very angry and upset with you medical people for not protecting me [sic] privacy. When use the machine in the unit

---

[3] Jackson's Amended Complaint and exhibits are unclear, but he appears to allege the inmates learned of his HIV-positive status on November 21 and/or 22.

others standing behind me can see me typing about my H.I.V. medication and treatment."
(Pl.'s Ex. A [ECF No. 1-1 at 1].)  The nurse responded that, per the nurse supervisor,
Jackson could use paper medical requests if he felt the kiosk was invading his privacy.
(*Id.*)

On December 16, 2020, Jackson filed another health request and grievance form.
(Pl.'s Ex. B [ECF No. 1-1 at 2].)  He complained that prisoners learned of his HIV status
because the machine for medical requests is out in the open where everyone can see the
monitor.  He asserted that the other prisoners had made demeaning comments and that as
a result, he felt depressed and isolated.  (*Id.*)  Defendant Mackenzie Johnson, the nurse
supervisor at the ADC, met with Jackson and memorialized in writing her explanation
that paper forms were available for medical requests.  (*Id.*)

On December 25, 2020, Jackson filed a health request and grievance form asking
for the ADC to issue a memorandum to medical and jail staff stating that to protect the
medical privacy rights of all detainees, a paper medical request form should be given at
the detainee's request.  (Pl.'s Ex. C. [ECF No. 1-1 at 3.]  He reiterated his concerns about
using the kiosk. (*Id.*)  He also stated that when he asked for a paper medical request form,
he was told to use the kiosk.  (*Id.*)  In response, the nurse indicated "paper kites will be
provided."  (*Id.*)

Jackson raised the same concerns with using the kiosk on January 10, 2021,
emphasizing the social setting where the digital kiosk is accessible.  (Pl.'s Ex. D [ECF
No. 1-1 at 4].)  Defendant Lieutenant Rich Rodriguez offered to make arrangements so
that Jackson could communicate with medical staff privately.  (*Id.*)  Jackson's grievance

4

on January 17, 2021, states that when he asked a nurse for a paper medical request, he was directed to a kiosk. (Pl.'s Ex. E [ECF No. 1-1 at 5].) An unknown officer, identified only as Officer 2371, stood by the kiosk. (*Id.*) Jackson asked Officer 2371 for paper medical requests. (*Id.*) The officer returned with paper medical request forms signed by a lieutenant. (*Id.*) Jackson claims that when he asked the officer how to spell the lieutenant's name, the officer responded "Rodriquer" with an emphasis on "quer" as an insult towards Jackson. (*Id.*) Jackson also asserts that Officer 2371 said he knew Jackson was the only one receiving paper medical requests—and why—because he could look it up. (*Id.*)

Jackson wrote to the superintendent of the prison asking why nothing had been done in response to the numerous grievances he filed. (Pl.'s Ex. F.) He reported that nurses continued to refuse to give him paper medical request forms. (*Id.*) He filed another grievance echoing the same complaints on January 25, 2021. (Pl.'s Ex. G [ECF No. 1-1 at 8].)

Based on the foregoing, Jackson filed a verified complaint under 28 U.S.C. § 1983 asserting causes of action under the Eighth and Fourteenth Amendments. He also asserted state law causes of action under the Minnesota Health Records Act ("MHRA")[4] and Minnesota Government Data Practices Act ("MGDPA").[5] (ECF No. 1-2, as amended by ECF No. 6.) On May 17, 2021, Jackson submitted an addendum to his Complaint clarifying that he intended to sue the individual Defendants (Sheriff Bob

---

[4] Minn. Stat. §§ 144.291–144.34.
[5] Minn. Stat. §§ 13.01–13.99.

Fletcher, Corrections Lieutenant Rich Rodriguez, and Nursing Supervisor MacKenzie Johnson) in their individual capacities. [ECF No. 10.]  Through his complaint, he seeks to "protect all detainees medical privacy/confidentiality when requesting medical treatment at the Ramsey County Adult Detention Center" and "$150,000 damages."  (Compl. § V.)[6]

During discovery, Defendants served requests for admissions on Jackson, asking that he

1. Admit that after [he] expressed privacy concerns regarding the use of the kiosk system … [he was] permitted to submit medical requests via paper form.
2. Admit that on December 15, 2020, [he was] informed in writing that [he was] permitted to use paper medical requests if [he] felt that kiosk system did not adequately protect [his] privacy.
3. Admit that on December 17, 2020, [he was] informed in writing that [he was] permitted to use paper medical requests if [he] felt that kiosk system did not adequately protect [his] privacy.
4. Admit that in response to [his] December 25, 2020, health care request and grievance form, [he was] informed in writing that [he was] permitted to use paper medical requests if [he] felt that kiosk system did not adequately protect [his] privacy.
5. Admit that in response to [his] January 10, 2021, health care request and grievance form, Lieutenant Rodriguez informed [him] in writing that if [he] needed to speak to medical staff privately, he would arrange it.
6. Admit that on January 10, 2021, [he was] given a paper kite form to use instead of using the kiosk if [he] wanted to submit a request for medical attention."

---

[6] Although Jackson checked the box on the civil cover sheet indicating the complaint is a class action [ECF No. 1-2, as corrected by ECF No. 6], the only suggestion in his complaint that he intended to act on behalf of others was his statement that he sought to protect the privacy of all detainees who requested medical treatment at the Ramsey County Adult Detention Center."  Setting aside the question of whether this sufficiently pleads a putative class action, he has not moved for certification of the class under Federal Rule of Civil Procedure 23.  More importantly, a pro se plaintiff may represent only himself in an action; "he may not litigate the claims of others, including the claims of any putative class." *Jackson v. Dayton*, Case No. 15-cv-4429 (WMW/JJK), 2016 WL 2931616, at *1 (D. Minn. Mar. 22, 2016), *adopted*, 2016 WL 2930913, at *1 (D. Minn. May 19, 2016); *Stone v. Jesson*, Case No. 11-cv-0951 (WMW/HB), 2019 WL 3769707, at *2 (D. Minn. May 30, 2019).

(Roche Decl. Ex. A [ECF No. 38-1].)  Jackson did not respond to the requests for

admission.  (Roche Decl. ¶ 2 [ECF No. 38].)

Defendants move for summary judgment on the grounds that 1) the individual

Defendants are entitled to qualified immunity as to Jackson's § 1983 claims, and 2)

Jackson cannot establish *Monell* liability.[7]  Jackson did not respond to Defendants'

motion.[8]

## II.    Analysis

### A.    Legal Standard

Summary judgment is appropriate "if the movant shows there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a).  A fact is "material" if it might affect the outcome of the case under

the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986).  A dispute over a fact is "genuine" if the evidence could support a jury verdict in

the non-moving party's favor.  *Id.*  The Court views the evidence and the inferences that

---

[7] Defendants' introduction identifies two other possible grounds for their motion:
"Plaintiff cannot recover compensatory damages under the Prison Litigation Reform Act
because he has not alleged or produced evidence of any physical harm in this case.
Plaintiff cannot obtain injunctive relief because he is no longer detained at the ADC and
has not alleged facts or produced evidence to suggest that he is likely to be detained at the
ADC in the future." (Defs.' Mem. Supp. Mot. Summ. J. at 2.)  However, Defendants'
brief never elaborates on these two sentences either factually or legally. Defendants have
therefore failed to carry their evidentiary and persuasive burdens as to those arguments.
[8] Plaintiff's failure to respond to defendants' summary judgment motion does not
automatically compel resolution of the motion in favor of defendants, but neither will the
Court make Plaintiff's arguments for him.  *See Soliman v. Johanns*, 412 F.3d 920, 922
(8th Cir. 2005) (addressing merits "despite [plaintiff's] failure to respond to the motion"
for summary judgment before the district court); *Pliler v. Ford*, 542 U.S. 225, 231 (2004)
(collecting cases holding that judges had no duty to perform legal chores for pro se
litigants).

may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996). "Only when a motion for summary judgment is 'properly supported' does the plaintiff have to produce evidence in order to defeat it." *Anderson v. Roberts*, 823 F.2d 235, 239 (8th Cir. 1987).

> **B.      Whether the Individual Capacity Claims Should Be Dismissed on Grounds of Qualified Immunity**

Qualified immunity "shields government officials from liability when their conduct does not violate clearly established constitutional rights of which a reasonable person would have known." *Ivey v. Audrain Cnty.*, 968 F.3d 845, 848 (8th Cir. 2020) (quoting *Thiel v. Korte*, 954 F.3d 1125, 1128 (8th Cir. 2020)). "Put simply, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (cleaned up).

Qualified immunity analysis involves two inquiries: (1) whether there has been a violation of a constitutional right; and (2) whether that right was clearly established at the time of the violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). As to the second prong, for the right to be "clearly established" at the time of the violation, "existing precedent must have placed the constitutional question beyond debate." *Hollingsworth v. City of St. Ann,* 800 F.3d 985, 989 (8th Cir. 2015) (internal quotes omitted). Moreover, it is not sufficient to show the right existed at a high level of generality; rather, a plaintiff must show the right was "clearly established in a particularized sense relevant to the case at hand." *Mettler v. Whitledge,* 165 F.3d 1197, 1203 (8th Cir. 1999).

Courts have liberty to choose the order of addressing the inquiries. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). "At summary judgment, qualified immunity shields [an official] from liability in a § 1983 action unless: (1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of deprivation." *Stark v. Lee Cnty.*, 993 F.3d 622, 625 (8th Cir. 2021). "The party asserting immunity always has the burden to establish the relevant predicate facts, and at the summary judgment stage, the nonmoving party is given the benefit of all reasonable inferences." *White v. McKinley*, 519 F.3d 806, 813 (8th Cir. 2008). "If there is a genuine dispute concerning predicate facts material to the qualified immunity issues, a district court must deny summary judgment." *Watson v. Boyd*, 2 F.4th 1106, 1109 (8th Cir. 2021) (cleaned up).

### 1.    Jackson's Fourteenth Amendment Claim

The Fourteenth Amendment safeguards individuals from unwarranted governmental intrusions into their personal lives. *Whalen v. Roe*, 429 U.S. 589, 598 n.23 (1977). The right to privacy encompasses two distinct interests: "[o]ne is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kins of important decisions." *Id.* at 599-600. The former concern, which has been characterized as the right to confidentiality, is at issue here.

The Eighth Circuit recognized a limited right to privacy outside the prison context in 1993. *See Alexander v. Peffer*, 993 F.2d 1348, 1350 (8th Cir. 1993). To violate the right to confidentiality under the Fourteenth Amendment, the court held, "the information disclosed must be either a shocking degradation or an egregious humiliation of her to

further some specific state interest, or a flagrant breach of a pledge of confidentiality which was instrumental in obtaining the personal information." *Id.* No published decision of the Eighth Circuit ever presented facts meeting this high standard. *See Eagle v. Morgan*, 88 F.3d 620, 625-26 (8th Cir. 1996) (dissemination of expunged criminal record not violation because it is not "inherently private" like medical or financial information); *Cooksey v. Boyer*, 289 F.3d 513, 515-16 (8th Cir. 2002) (disclosure of fact that former police chief sought treatment for stress not an "egregious humiliation" or "shocking degradation").

In 1996, the Eighth Circuit rejected a prisoner's claim that his constitutional right to privacy of medical information under the Fourteenth Amendment was violated when prison officials disclosed his HIV-positive status by segregating HIV-positive inmates. *Tokar v. Armontrout*, 97 F.3d 1078, 1084 (8th Cir. 1996). The court relied on the Seventh Circuit's decision in *Anderson v. Romero*, 72 F.3d 518 (7th Cir. 1995), which held that no constitutional violation occurs where the need to protect guards and inmates from infection prompted the disclosure of the sensitive information. *Id.* at 19. Similarly, the court quoted the Eleventh Circuit's decision in *Harris v. Thigpen*, 941 F.2d 1495 (11th Cir. 1991) for the proposition that even if a limited right to privacy existed, that right must yield to reasonable prison policy. *Id.* 1521. Nowhere did it discuss *Peffer* and its progeny.

Since *Tokar*, most courts have held, in line with the cases cited in *Tokar*, that a prisoner has a limited right to privacy under the Fourteenth Amendment that yields to a

reasonable prison policy.[9]  *See Powell v. Schriver*, 175 F.3d 107, 112 (2d Cir. 1999); *Doe v. Delie*, 257 F.3d 309, 315-16 (3d Cir. 2001); *Moore v. Mabus*, 976 F.2d 268, 271 (5th Cir. 1992); *Beers v. Stockton,* 242 F.3d 373 (8th Cir. 2000) (table decision) (disclosure of inmate's medical information related to penological concerns as in *Powell*); *Seaton v. Mayberg*, 610 F.3d 530, 535 (9th Cir. 2010) (civil commitment context), *cert. denied*, 562 U.S. 1222 (2011).  Courts have sanctioned disclosure of medical information such as HIV status pursuant to reasonable policies that protect prisoners and staff from communicable diseases and violence, or those that promote rehabilitative efforts.  *Seaton*, 610 F.3d at 535.  The natural corollary of these cases would seem to be that an incarcerated individual has a right to be free from *unjustified* disclosure of sensitive medical information, or at least such information the disclosure of which would constitute a "shocking degradation or an egregious humiliation."  *But see Nunes v. Mass. Dep't of Corr.*, 766 F.3d 136, 144 (1st Cir. 2014) (declining to decide); *Doe v. Wigginton*, 21 F.3d 733, 740 (6th Cir. 1994) (no right to privacy), *disagreed with in part*, *Moore v. Prevo*, 379 F. App'x 425, 427 & n.4 (6th Cir. 2010) (adopting *Delie* and holding that *Wigginton* does not extend to disclosure of a prisoner's medical information to other inmates).

Prior to 2020, some district courts in this circuit confronted with an inmate's claim that prison officials violated his or her right to informational privacy determined the right was not clearly established at the time of the alleged violation.  *See, e.g., Leher v. Bailey*, Case No. 03-cv-952, 2006 WL 1307658, at *5 (E.D. Ark. May 10, 2006) ("Thus, it is

---

[9] *See Turner v. Safley*, 482 U.S. 78 (1987).

with confidence that the undersigned reaches the conclusion that there was no clearly established right in 2003 under the Fourteenth Amendment for an inmate not to have medical information, such as HIV status, disclosed by government actors regardless of whether or not the actors made the disclosure on the basis of a legitimate penological reason."); *Richey v. Ferguson*, Case No. 05-cv-5162, 2007 WL 710129, at *24 (W.D. Ark. Mar. 6, 2007) (right not clearly established in 2005); *Harris v. City of Caruthersville,* Case No. 09-cv-81, 2009 WL 2836521, at *3 (E.D. Mo. Aug. 31, 2009) (right not clearly established); *Hinton v. Noel*, Case No. 04:10-cv-230-CEJ, 2010 WL 1222036, at *2 (E.D. Mo. Mar. 30, 2010) (same). Others, by contrast, have assumed such a right existed and have proceeded to assess the alleged violation under *Peffer* or *Powell* and *Delie*. *See, e.g., Bolt v. Doe*, Case No. 5:14-cv-5223, 2014 WL 5797706, at *6 (W.D. Ark. Nov. 7, 2014) (no violation under the standard articulated in *Cooksey* and *Tokar*); *White v. Helder*, Case No. 05:14-cv-05138, 2015 WL 3904038, at *4 (W.D. Ark. June 25, 2015) (claim plausible under *Doe* and *Powell* where plaintiff alleged that use of a kiosk system resulted in the dissemination of confidential medical information to non-medical staff); *Haid v. Cradduck*, Case No. 5:14-cv-5119, 2015 WL 13736232, at *8 (W.D. Ark. Dec. 21, 2015) (right to privacy with respect to medical information generally was clearly established by 2013); *Peikkola v. Jackley*, Case No. 4:15-cv-04148-KES, 2016 WL 917914, at *7 (D.S.D. Mar. 8, 2016) (claim for inappropriate disclosure of medical information under *Doe, Powell,* and *Eagle* survives § 1915A screening). *See also Bailey v. Cnty of Kittson*, Case No. 07-cv-1939 (ADM/RLE), 2008 WL 906349, at *7 (D. Minn. Mar. 31, 2008) (assuming right exists without deciding); *Haid v. Cradduck*,

Case No. 5:14-cv-5119, 2016 WL 3555032, at *5 (W.D. Ark. June 24, 2016) (same); *West v. Palmer*, Case No. 14-cv-4102-LTS, 2017 WL 3574442, at *7 (N.D. Iowa Aug. 17, 2017) (same).

But notwithstanding Eighth Circuit caselaw on the right to informational privacy generally and *Tokar's* suggestion that a prisoner may have a limited right of privacy in medical information, the Eighth Circuit has recently called into question whether *any* constitutional right to informational privacy exists—even outside of a prison system. *Dillard v. O'Kelley*, 961 F.3d 1048, 1054 (8th Cir. 2020) (en banc), *cert. denied*, 141 S. Ct. 1071 (2021). *Dillard* concerned a 2015 Freedom of Information Act request that resulted in the disclosure by the City of Springdale Police Department of a redacted investigative report detailing sexual misconduct by Josh Duggar. *Id.* at 1050. Duggar's alleged victims sued the police department because the redactions were insufficient to hide their identities and other personal details, which were subsequently publicized. *Id.* at 1052. A panel of the Eighth Circuit affirmed the district court's denial of the individual defendants' motion to dismiss based on qualified immunity, but the court *en banc* reversed, stating that "the asserted due process right to informational privacy was not clearly established." *Id.* at 1050. The Eighth Circuit specifically repudiated broad readings of *Whalen* that courts in this circuit and others have relied upon to recognize a substantive due process right to informational privacy. *Id.* at 1053-54. At the very least, "the uncertain status of the right to informational privacy means that Defendants are entitled to qualified immunity." *Id.* at 1055. No Eighth Circuit case since *Dillard* has shored up the status of a right to informational privacy, much less its metes and bounds.

In view of *Dillard*, the individual Defendants in this action are entitled to qualified immunity on the ground that as of the time of the conduct complained of here, a constitutional right to informational privacy under the Fourteenth Amendment was not clearly established. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (conduct must "violate clearly established statutory or constitutional rights of which a reasonable person would have known"). The Court is unaware of a "robust consensus of cases of persuasive authority" since *Dillard* that have put the constitutional question presented beyond debate. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735, 741 (2011).

Even if the constitutional right was clearly established, the record would not support a finding that the individual Defendants themselves violated that right. "Authorities not involved in the allegedly unconstitutional acts of their fellow public servants have not violated constitutional rights and are entitled to qualified immunity." *Heartland Acad. Cmty. Church v. Waddle*, 595 F.3d 798, 805-06 (8th Cir. 2010). Although Defendants do not dispute for purposes of this motion Jackson's allegations that some inmates learned of his private medical information by viewing the monitor when he used the medical kiosk on November 21 or 22, 2020, the record contains no evidence upon which a reasonable jury could conclude that Sheriff Fletcher, Lieutenant Rodriguez, or Nurse Johnson personally disclosed it. Nor does the record contain any facts that would support a finding that any of the three individual Defendants was personally responsible for designing the kiosk in such a way as to permit disclosure of confidential health information. Finally, although the circumstances surrounding Officer 2371 are not well developed, Jackson does not allege that he learned the information

from any of the individual Defendants, or even from the kiosk, but that he looked up Jackson's information himself.

Because the individual Defendants are not directly responsible for the disclosure of Jackson's health information, they are entitled to qualified immunity. *See Richey,* 2007 WL 710129, at *24-25 (no evidence individual defendants posted publicly-available record of health information); *Bolt*, 2014 WL 5797706, at *5 (same on motion to dismiss). Accordingly, the Court recommends that Defendants' motion for summary judgment should be granted as to Jackson's individual-capacity claims for violations of his right to privacy under the Fourteenth Amendment.

### 2.    Jackson's Eighth Amendment Claim

The Eighth Amendment "prohibits the infliction of cruel and unusual punishments on those convicted of crimes." *Wilson v. Seiter*, 501 U.S. 294, 296-97 (1991). "Not every governmental action affecting the interests or well-being of a prisoner is subject to Eighth Amendment scrutiny, however." *Whitley v. Albers*, 475 U.S. 312, 319 (1986). "Only unnecessary and wanton infliction of pain constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Id.* Eighth Amendment claims involve both an objective and a subjective component. The plaintiff must demonstrate that "(1) the conditions were objectively sufficiently serious or caused by an objectively serious injury to the plaintiff, and (2) that the defendants were deliberately indifferent, or acted with reckless disregard, to inmate constitutional rights, health, or safety." *Berryhill v. Schriro*, 137 F.3d 1073, 1076 (8th Cir. 1998).

While the Eighth Circuit has not addressed the disclosure of confidential medical information in the context of the Eighth Amendment, the Seventh Circuit has recognized that

> certain disclosures of medical information or records would be actionable . . . under the cruel and unusual punishments clause of the Eighth Amendment rather than under the due process clause of the Fourteenth. If prison officials disseminated humiliating but penologically irrelevant details of a prisoner's medical history, their action might conceivably constitute the infliction of cruel and unusual punishment; the fact that the punishment was purely psychological would not excuse it.

*Anderson*, 72 F.3d at 523, *cited favorably in Tokar*, 97 F.3d at 1084. For instance, the Seventh Circuit posited, "if employees of the prison, knowing that an inmate identified as HIV positive was a likely target of violence by other inmates yet indifferent to this fact, gratuitously revealed his HIV status to other inmates and a violent attack upon him ensued," the employees would be liable. *Id.* The Second Circuit, echoing Judge Posner's decision in *Anderson*, held that a reasonable official would have known that disclosing medical information that would place an inmate in harm's way, absent a legitimate penological purpose, could constitute deliberate indifference to a substantial risk. *Powell*, 175 F.3d at 114-15. In *Powell*, prison officials disclosed the plaintiff's transsexualism and HIV-positive status, which led to harassment by fellow inmates and guards. *Id.* at 109. In both cases, the focus was on whether in disclosing the private information, the disclosing officers were deliberately indifferent to the plaintiff's safety.

Jackson's Amended Complaint, construed liberally, suggests two possible theories of liability: 1) Defendants were deliberately indifferent to Jackson's constitutional rights, and 2) Defendants were deliberately indifferent to Jackson's safety and well-being. But

under either theory the individual Defendants are entitled to qualified immunity because Plaintiff cannot establish a constitutional violation: nothing shows Defendants were deliberately indifferent.

The deliberate indifference element has two components: an objective prong—the existence of an excessive risk to inmate health or safety; and a subjective prong—that the actor "know[s] of and disregard[s]" that excessive risk. *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). Under the subjective prong, "the evidence must show that the officers recognized that a substantial risk of harm existed *and* knew that their conduct was inappropriate in light of that risk." *Krout v. Goemmer*, 583 F.3d 557, 567 (8th Cir. 2009). After showing knowledge, the plaintiff must then demonstrate the actor deliberately disregarded that risk. *Jackson v. Everett*, 140 F.3d 1149, 1152 (8th Cir. 1998). "A party need not necessarily show that the actor knew of the substantial risk of harm to an inmate; the district court can infer knowledge if the risk is obvious." *Letterman v. Does*, 789 F.3d 856, 862 (8th Cir. 2015). But deliberate indifference is more than mere negligence or even gross negligence. *Farmer*, 511 U.S. at 835. The test is akin to the criminal rule of "recklessness." *Id.*

To the extent Plaintiff's Eighth Amendment claim rests on the theory that Defendants were deliberately indifferent to his right to informational privacy, the claim must be rejected in light of the Court's conclusion that the underlying constitutional right to informational privacy is not clearly established. An officer cannot be said to have recklessly disregarded a known risk of harm to a constitutional right when the contours of the right have not been set. *Cf. Szabla v. City of Brooklyn Park*, 486 F.3d 385, 393 (8th

17

Cir. 2007) (en banc) ("[A] municipal policymaker cannot exhibit fault rising to the level of *deliberate* indifference to a constitutional right when that right has not yet been clearly established.")

The alternate theory, that Defendants were deliberately indifferent to Jackson's safety and well-being, presents a closer question, but ultimately, it too is unavailing. To be sure, even though there is no evidence that any of the Defendants personally disclosed Jackson's medical information, Defendants could face liability if they failed to take corrective action to mitigate a known and objectively serious risk of harm. *See Choate v. Lockhart*, 7 F.3d 1370, 1376 (8th Cir. 1993) ("Supervisors can incur liability for cruel and unusual punishment in two ways: they can be liable for their personal involvement in a constitutional violation, or when their corrective inaction amounts to deliberate indifference to or tacit authorization of the violative practices.") (cleaned up). But even taking the facts in the light most favorable to Jackson, there is nothing in the record from which one could conclude that the individual Defendants actually knew that disclosure was a risk prior to November 22, 2020, the later of the two dates on which Jackson alleges his HIV status was disclosed to fellow inmates while he used the kiosk. Although Jackson told unidentified nurses about his privacy concerns (Compl. ¶¶ B, C), there is no evidence that these complaints ever made it to the ears of the individual Defendants before Jackson's HIV status was disclosed. And there is no evidence that any of Jackson's complaints came to Sheriff Fletcher's attention at any point. At best, the evidence indicates that Nurse Johnson first learned of potential privacy concerns on December 17, 2020, when she met with Jackson to discuss them; Lieutenant Rodriguez

learned of such concerns on January 1, 2021, through Jackson's grievances.  But Jackson does not allege that there was any further disclosure of his HIV status arising out of his use of the kiosk after November 2020.

Furthermore, even if one could infer the individual Defendants knew of the risk before November 2020 because the risk of and the harm resulting from inadvertent disclosure were obvious, nothing in the record suggests they were deliberately indifferent to that risk.  There is no evidence that Fletcher, Rodriguez, or Johnson had input into the design of the kiosk screen in the first place, or the authority to change it even if they had known of the risk of disclosure and recognized it as an objectively serious harm prior to November 2020.  And, both Lieutenant Rodriguez and Nurse Johnson unequivocally accommodated Jackson's requests, once brought to their attention, that he be allowed to use paper forms instead.[10]  *See Choate*, 7 F.3d at 1375 (evidence of deliberate indifference to inmate's worksite safety belied by testimony indicating individual defendants were safety-conscious); *Letterman*, 789 F.3d at 865 (no deliberate indifference where official took steps to abate plaintiff's risk of injury).

Accordingly, Defendants are entitled to qualified immunity because a reasonable finder of fact could not conclude on this record that the individual Defendants violated

---

[10] Jackson's Amended Complaint suggests that unidentified other nurses and jail staff disregarded those directives, but he does not allege that any of the individual Defendants were responsible.  Furthermore, by failing to respond to Defendants' requests for admissions, he admitted those matters, including, *inter alia,* that "after [he] expressed privacy concerns regarding the use of the kiosk system … [he was] permitted to submit medical requests via paper form."  Roche Decl. Ex. A.  *See* Fed. R. Civ. P. 36(a)(3) ("A matter is admitted unless, within 30 days after being served, the party to whom the request is directed serves on the requesting party a written answer or objection addressed to the matter.").

Jackson's right to be free from cruel and unusual punishment under the Eighth Amendment. The Court therefore recommends that Defendants' motion for summary judgment be granted as to Jackson's Eighth Amendment claims.

### C.    Official and Municipal Liability

Jackson's claims against Ramsey County ADC must be treated as claims against Ramsey County because the ADC is not an independent legal entity capable of being sued. *See, e.g., Flores v. United States.*, 689 F.3d 894, 899 n.4 (8th Cir. 2012) (recognizing Ramsey County departments are not legal entities capable of being sued). The same is true for Jackson's official-capacity claims. Official-capacity claims "generally represent only another way of pleading an action against the entity of which an officer is an agent," and "suits against officials in their official capacity therefore should be treated as suits against the [governmental entity]." *Hafer v. Melo*, 502 U.S. 21, 25 (1991) (cleaned up). Thus, Jackson's claims against the Ramsey County ADC and against the named Defendants in their official capacities will be treated together and as entity claims against Ramsey County.

Section 1983 holds accountable a person who "subjects, or causes to be subjected any . . . person . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws[.]" 42 U.S.C. § 1983. Liability for a constitutional violation may attach to a municipality if the violation resulted from (1) an official municipal policy, (2) an unofficial custom, or (3) a deliberately indifferent failure to train, supervise, or discipline. *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S.

658, 690-91 (1978); *City of Canton v. Harris*, 489 U.S. 378, 388 (1989); *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 407 (1997).

In instances where the municipality's decision subjects the plaintiff to a risk of a constitutional violation, "a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a causal link between the municipal action and the deprivation of federal rights." *Brown*, 520 U.S. at 404. "A plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow from the decision." *Id.* at 411. "[A] municipal actor [must have] disregarded a known or obvious consequence of his action." *Id.* at 410. "Only where a municipality's failure to adopt adequate safeguards was the product of deliberate indifference to the constitutional rights of its inhabitants will the municipality be liable for an unconstitutional policy under § 1983." *Szabla*, 486 F.3d at 390.

The Ramsey County ADC made the decision to process inmates' medical requests through a digital kiosk—as opposed to paper forms—and decided that the kiosk could only be accessed in a particular area and during particular times. The area and times it chose happened to be where and when other inmates were present—as opposed to various other potential places and times (although there is no evidence from either side about what those alternatives were and to what extent they might have afforded more privacy). *See Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985) (holding municipality must have chosen from among various alternatives). But to prevail on his theory against Ramsey County, Jackson must show 1) an actual violation of his constitutional rights and

2) that the specific constitutional violations were a known or plainly obvious consequence of the ADC's practice of requiring inmates to enter medical information under those conditions that it can be said to have been deliberately indifferent to Jackson's rights or to his well-being.

Even assuming Jackson could show a violation of his constitutional rights, he cannot show a policy of deliberate indifference. First, it cannot be said that the ADC deliberately ignored an obvious need for additional safeguards to protect Jackson's right to informational privacy, because the contours of that right—indeed, its very existence—are not clearly established. *Szabla*, 486 F.3d at 394. Second, the record does not support a theory that the ADC was deliberately indifferent to Jackson's well-being. There is no evidence that decisionmakers knew prior to the disclosure of Jackson's HIV status in November 2020 of privacy concerns or complaints relating to the setting of the medical request kiosk, whether raised by Jackson or anyone else. The Court also notes that one of the ADC's stated reasons for instituting the kiosk system in place of paper forms was to try to minimize disclosure of confidential medical information to those who had no need to see it—a rationale that, even if imperfect in its execution, is nevertheless at odds with the claim that there was a deliberate indifference to Jackson's, or any detainee's, right to keep that information confidential or to the harm that might result from its accidental disclosure.

Therefore, the Court recommends that Defendants' motion for summary judgment be granted as to Jackson's claims for monetary and prospective relief against Ramsey County and the individual Defendants in their official capacities.

### D.     State Law Claims

Jackson lists on his civil cover sheet the MHRA and MGDPA as statutes under which he is filing.  His claims presumably rely on the same set of facts, although the complaint does not elaborate any theory of liability under these statutes, and he never responded to Defendants' motion for summary judgment.  Although Defendants move for complete summary judgment, their briefing neglected this aspect of Jackson's complaint.

Because the Court recommends granting summary judgment to Defendants on Jackson's federal claims, the Court must determine whether to exercise supplemental jurisdiction over Jackson's state law claims.  The Court "may decline to exercise supplemental jurisdiction over a claim . . . if the [Court] has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).  In making this decision, the Court should consider the principles of judicial economy, comity, fairness, and convenience.  *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988).  The normal practice when federal claims are dismissed prior to trial is to dismiss the supplemental state claims as well.  *See Ivy v. Kimbrough*, 115 F.3d 550,  552-53 (8th Cir. 1997). "Where, as here, resolution of the claims depends solely on a determination of state law, the Court should decline to exercise jurisdiction."  *Farris v. Exotic Rubber & Plastics of Minn., Inc.*, 165 F. Supp. 2d 916, 917 (D. Minn. 2001).  After considering all the relevant factors, the Court recommends the exercise of supplemental jurisdiction over Jackson's state law claims be declined and recommends those claims be dismissed without prejudice to refiling in state court.

### III.    Recommendation

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** as follows:

1.    Defendants' Motion for Summary Judgment [ECF No. 34] be **GRANTED** with respect to Jackson's § 1983 claims for violations of his rights under the Eighth and Fourteenth Amendments;

2.    Jackson's remaining state law claims under the Minnesota Health Records Act and Minnesota Government Data Practices Act be **DISMISSED WITHOUT PREJUDICE** to refiling in state court; and

3.    Judgment be entered accordingly.

Dated: May 28, 2022                    _/s Hildy Bowbeer_____
                                       HILDY BOWBEER
                                       United States Magistrate Judge